IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WENDY AMES, et al. | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL NO. L-04-267 |
| | : | |
| APOTHECON, INC., et al. | : | |
|     Defendants. | : | |

## MEMORANDUM

This products liability case tests whether the manufacturer's warnings for Amoxicillin, a prescription drug, were adequate. Following discovery, the defendants moved for summary judgment. For the reasons set forth below, the Court will, by separate Order, GRANT the defendants' motion and enter judgement on all counts in their favor.[1] (Docket No. 74).

## I.   Introduction

Amoxicillin, which for decades has been a staple of the pediatrician's pharmacopeia, is perhaps the most prescribed drug in the country. Notwithstanding its widespread safe use, the drug has a rare but serious side effect, Toxic Epidermal Necrolysis (TEN), a hypersensitivity reaction that can cause death. Tragically, a generic Amoxicillin product (Trimox®) that the minor-plaintiff, Catherine Shea Welch, took for strep throat triggered a TENs reaction that left her blind. Shea has sued Apothecon, Inc. ("Apothecon"),[2] the manufacturer of Trimox®. All

---

[1] On April 19, 2006, the plaintiffs filed a Motion for Leave to File a Sur-Reply Brief. (Docket No. 92). The Court has considered the Sur-Reply and will, by separate order, GRANT the motion.

[2] Shea has also sued Bristol-Myers Squibb Co. ("BMS"), Apothecon's parent corporation.

four of the counts asserted in her complaint reduce down to one claim, that Apothecon's warnings of the risks of taking Trimox® were inadequate.[3]

Following discovery, Apothecon moved for summary judgment. On March 23, 2006, the Court held a three hour hearing that centered on a list of thirteen questions that the Court had submitted to counsel in advance. Under Maryland law, the "learned intermediary" doctrine compels the Court to grant the motion and enter judgment for Apothecon. The doctrine's essence is that if the prescribing doctor (the learned intermediary) has received adequate notice of a drug's risks the manufacturer has no duty to warn the consumer.[4] The doctrine is dispositive because the pediatrician, Alvaro Ramos, M.D., who prescribed Amoxicillin for Shea's strep throat, testified that,

(i) TEN and its less severe form, Stevens-Johnson Syndrome (SJS), are recognized risks associated with Amoxicillin,

(ii) he learned of these risks in medical school, and he was aware of them when he prescribed Amoxicillin for Shea,

(iii) although he did not read the Trimox® package insert, he had read an identical package insert for another Amoxicillin product, which specifically referenced a risk of SJS and TEN,

(iv) in his practice, he prescribes Amoxicillin more than any other drug,

---

[3] The plaintiffs raise four causes of action in the complaint: (1) defective design; (2) marketing defect; (3) breach of implied warranty; and (4) negligence. Each of these boils down to whether Apothecon adequately warned Dr. Ramos of the connection between Amoxicillin and TEN. See Weinberger v. Bristol-Myers Co., 652 F. Supp. 187, 191-92 (D. Md. 1986) (holding that the issue in both a negligence claim and a strict liability claim is whether the warning is adequate); Fellows v. USV Pharm. Corp., 502 F. Supp. 297, 298-99 (D. Md. 1980) (holding that four causes of action (negligence, breach of warranty of merchantability, strict liability and misbranding) are all defeated by an adequate warning).

[4] Lee v. Baxter Health Care, Corp., 721 F. Supp. 89, 94-95 (D. Md. 1989).

(v)     despite Shea's adverse reaction, he increasingly prescribes Amoxicillin because it is more successful in treating resistant strains of bacteria than many other antibiotics, and

(vi)    even today, knowing of the tragedy that befell Shea and of the arguments advanced by her counsel, he would prescribe Amoxicillin for a similar patient presenting with strep throat.

The record, therefore, establishes that the medical community in general and Dr. Ramos in specific were fully aware of the risk of TEN associated with Amoxicillin. Accordingly, there was no failure to warn.

**II.     Background**

On February 2, 2001, Dr. Ramos diagnosed Shea Welch, who was then six, with strep throat and prescribed a ten day regimen of Amoxicillin. (Am. Complt. ¶ 11). When Dr. Ramos wrote the prescription, he did not specify a brand. He knew that the pharmacist would fill the prescription with a generic brand but he had no way of knowing which one.[5] It was a fortuity that the pharmacist selected Trimox® rather than one of the other generic Amoxicillins, all of which are identical in chemical composition.[6] (Def.'s Ex. E).

When Dr. Ramos prescribed Amoxicillin for Shea, he did not warn Shea's parents of the risk of TEN. Amoxicillin is a standard regimen for strep throat approved by the American Academy of Pediatrics's "Red Book."[7] (Rep. Dr. Wientzen, p. 3). Before her adverse reaction, Shea had taken the drug on four prior occasions without incident. (Def.'s Ex. F). There was

---

[5]     Dr. Ramos indicated on the prescription that the pharmacist should fill the prescription with a generic version of Amoxicillin. (Dep. Dr. Ramos, p. 42).

[6]     Trimox® is a generic version of Amoxicillin. The reference drug is a GlaxoSmithKline Amoxicillin product, which is marketed as Amoxil®.

[7]     See Rep. Dr. Raoul Wientzen, p. 3; American Academy of Pediatrics, Red Book: Report of the Committee on Infectious Diseases 530 (25th ed. 2000).

nothing in her medical history to indicate that she would be visited by a hypersensitivity reaction. The plaintiffs have not sued Dr. Ramos for medical malpractice.

On February 12, 2001, the day after Shea had completed the ten day regimen, she contracted a fever and developed a rash on her back and chest. (Rep. Dr. Wientzen, p. 1; Dep. Wendy Ames, p. 36). The next day, on February 13, 2001, Shea was admitted to the Carroll County Hospital emergency room. She was given Benadryl and Ranitidine, but the rash continued to spread over her extremities, including her mouth and eyes. (Pl.'s Ex. 16). On February 14, 2001, Shea was transferred to the pediatric intensive care unit of Sinai Hospital. At Sinai, the rash developed into lesions over her body and face. (Rep. Dr. Stevens, p. 3).

Dr. Ina Stephens, a pediatric infectious disease specialist, promptly diagnosed Shea with SJS/TEN. (Pl.'s Ex. 17). Shea remained at Sinai Hospital for over a month while being treated. Tragically, Shea developed scarring of her skin and corneas, and she is now blind. (Pl.'s Ex. 21). The plaintiffs concede that Shea's condition was promptly diagnosed and appropriately treated.

SJS/TEN is a drug-induced, life threatening, mucocutaneous reaction that causes the "erosion of the mucous membranes" and "extensive detachment" of the skin. (Def.'s Ex. I). It is a recognized adverse reaction to Amoxicillin. (Dep. Dr. Ramos, p. 7). SJS/TEN can be viewed as a continuum, with TEN (more severe) and SJS (less severe) on opposite ends and the "SJS/TEN Overlap" in the middle. (Def.'s Ex. L).

Since 1998, the "Adverse Reaction" section of the Trimox® package insert has stated, "The following adverse reactions have been reported as associated with the use of penicillins ... Stevens Johnson Syndrom, toxic epidermal necrolysis...." The "Warnings" section of the insert

cautions, "Serious and occasionally fatal hypersensitivity (anaphylactic) reactions have been reported in patients on penicillin therapy."[8] (Def.'s Exs. M, T, and U).

The plaintiffs claim that these warnings are inadequate for three reasons:

(i) The warning does not properly advise doctors of the symptoms of early SJS/TEN.

As a result, doctors are less likely to spot the problem and discontinue Amoxicillin in time to avoid increased harm.

(ii) The warning should be listed in the Warnings section of the insert (rather than the Adverse Reactions section) where it is more likely to be noticed and heeded.[9]

(iii) Although the package insert specifically mentions SJS and TEN, it does not state the incidence rate of the adverse reaction.

Dr. Ramos testified, however, that none of the improvements to the warnings advocated by the plaintiffs would have (i) added materially to what he already knew about TEN, or (ii) altered his decision to prescribe Amoxicillin for Shea. He testified that the relationship between Amoxicillin and TEN is well known within the medical community. (Dep. Dr. Ramos, p. 7). When he prescribed Amoxicillin for Shea in 2001, he knew from his medical training about "the strong causal relationship between Amoxicillin and toxic epidermal necrolysis or TEN." (Dep. Dr. Ramos, p. 7). He appreciated that TEN is a serious side effect, but he understood (correctly) that the condition is "rare." In his practice today, Dr. Ramos prescribes Amoxicillin more frequently than any other drug. (Dep. Dr. Ramos, p. 89). His preference for Amoxicillin is on

---

[8] The insert also states, "Whenever such reactions occur, Amoxicillin should be discontinued unless, in the opinion of the physician, the condition being treated is life-threatening and amenable only to Amoxicillin therapy."

[9] The plaintiffs' expert, Dr. Blume, states that the most "serious" adverse reactions are listed in the Warnings section. (Rep. Dr. Blume, p. 7).

the increase because the drug is more effective than many other antibiotics in treating resistant strains of bacteria. (Dep. Dr. Ramos, p. 90).

Dr. Ramos testified that he has never read the Trimox® package insert. Nonetheless, before he treated Shea, he had read an identical package insert for another generic brand of Amoxicillin. (Dep. Dr. Ramos, p. 96). By law, the warnings for all Amoxicillin brands must be identical down to the last syllable.[10] Quite literally, if a doctor has read one, he has read them all. Dr. Ramos considers the Amoxicillin warnings to be adequate and duplicative of what he already knows. He testified that it made no difference to him whether the SJS/TEN warning appeared in the Warnings or the Adverse Reaction section. (Dep. Dr. Ramos, p. 84). Dr. Ramos stated that, even today, knowing of Shea's tragedy and the arguments made by her counsel, he would prescribe Amoxicillin for a similar patient with a strep throat. (Dep. Dr. Ramos, p. 81-82). For Dr. Ramos and other pediatricians, the risk of TEN is low enough to make Amoxicillin a prudent choice for treating strep throat and other infections. In fact, Dr. Ramos has permitted his own daughter to take Amoxicillin. (Dep. Dr. Ramos, p. 97).

**III.        Expert Reports**

In support of their claims, the plaintiffs submitted the expert report of Cheryl Blume, Ph.D.[11] Doctor Blume is not a medical doctor, she does not treat patients, and she has never

---

[10]  See 21 C.F.R. § 314.94(a)(8)(iv) ("Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the [generic] drug product must be the same as the labeling approved for the reference listed drug.").

[11]  Dr. Blume received her Ph.D. in Medical Pharmacology and Toxicology from The West Virginia University Medical Center. She is currently the President of Pharmaceutical Development Group, Inc., a consulting firm specializing in pharmaceutical development and registration. (Rep. Dr. Blume, p. 1).

6

prescribed Amoxicillin or any other drug.  She does, however, have a degree in Medical Pharmacology and Toxicology.  Dr. Blume conducted a statistical analysis of the Federal Drug Administrations's (FDA) "Adverse Event Database."  Based on that study she drew two conclusions.  First, that TEN is an adverse reaction caused by Amoxicillin.  Second, that those who take Amoxicillin are more likely to develop TEN than those who take sulfa drugs for a bacterial infection.[12]  (Rep. Dr. Blume, p. 11).  With respect to the second point, Dr. Blume offers the following quote from the "Mockenhaupt"[13] study:  "[A] patient taking Amoxicillin was 11 times more likely to develop a severe adverse cutaneous reaction than a similarly matched control patient."  (Rep. Dr. Blume, p. 6).

In her report, Dr. Blume opines that (i) the TEN warning should have been in the Warnings section, and (ii) that "the information that is included with the Amoxicillin labeling Adverse Events section is inadequate and fails to note an association or causal relationship."  (Rep. Dr. Blume, p. 7).  When a warning is in the Warnings section, she contends, prescribing doctors are more likely to notice the warning and to be more cautious in encountering the risk.

---

[12]   "Sulfa drugs" are antibiotics that are used to treat bacterial and fungal infections.  Sulfa drugs were used before penicillin was discovered and are still used today.  See "Definition of Sulfa Drug" WebMD Health, http://www.medterms.com/script/main/art.asp?articlekey=14498 (December 21, 2001).

[13]   Although she does not provide a citation for the paper or state where it is published, Dr. Blume refers to the study as "Mockenhaupt *et al.*, 2003."

The defendants' expert, Robert S. Stern, M.D.,[14] agrees that TEN is a adverse reaction associated with Amoxicillin. He disagrees, however, that Amoxicillin triggers a TEN reaction more often than do sulfa drugs. He charges Dr. Blume with misinterpreting the Mockenhaupt study, of which Dr. Stern himself is the senior author. His studies, Dr. Stern states, "demonstrate a substantially lower risk of SJS/TEN associated with Amoxicillin than with sulfonamide antibiotic." (Rep. Dr. Stern, p. 6).

The debate between the experts need not be resolved by the jury. Dr. Blume does not dispute the aspect of Dr. Stern's testimony that is critical to the application of the learned intermediary doctrine. Based on published statistics, Dr. Stern concludes that only 1 individual out of every 3.5 million people who take a 10 day course of Amoxicillin develops SJS/TEN.[15] Dr. Stern's testimony, therefore, fully corroborates Dr. Ramos's understanding that the risk of TEN is "rare."

**IV.        Standard**

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[14]     Dr. Stern graduated from Yale Medical School and received post-graduate training at Mt. Sinai Hospital in New York, the National Institute of Health, Massachusetts General Hospital, and Harvard Medical School. He is currently the Carl J. Herzog Professor of Dermatology at Harvard Medical School and Chair of the Department of Dermatology at the Beth Israel Deaconess Medical Center. (Rep. Dr. Stern, p. 1-2).

[15]     See Rep. Dr. Stern, p. 5 (citing Jean-Claude Roujeau, M.D., et. al., Medication Use and the Risk of Stevens-Johnson Syndrome, 333 New Eng. J. Med. 1600 (Dec. 14, 2005).

of law."[16] Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.[17]

The Court must apply the above standard to the record created by the parties in this case. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."[18] "[T]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."[19]

## V.     Analysis

The plaintiffs point to three defects in the Trimox® package insert: (1) the omission of the TEN symptoms, (2) the lack of a TEN warning in the Warnings section, and (3) the failure to describe the incidence rate.[20] To determine whether the Trimox® warning was or was not

---

[16]     Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

[17]     Pulliam Inv. Co. v. Cameo Prop., 810 F.2d 1282, 1286 (4th Cir. 1987).

[18]     Weinberger, 652 F. Supp. at 189 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252-53 (1986)).

[19]     Anderson, 477 U.S. at 252.

[20]     One of the written questions that the Court posed to counsel before the March 23rd hearing asked whether the plaintiff was claiming that the defendants and the other Amoxicillin manufacturers had perpetrated a "fraud" on the FDA by under-reporting the risk of SJS/TEN. At oral argument, counsel for the plaintiffs, John C. Evans, stated that this was, in

9

adequate, the Court must apply Maryland law.[21] Under Maryland law, a warning is adequate if it "explains the risk which allegedly caused the plaintiff's injury."[22] The warning must only be reasonable, not the best possible one.[23]

Maryland law recognizes the "learned intermediary" doctrine, which provides that manufacturers need only warn the prescribing physician and not the patient directly.[24] If the physician has been adequately warned, he is a "learned intermediary" because he is in the "best position to understand the patient's needs and assess the risks and benefits of a particular course of treatment."[25] The doctrine countenances the learned intermediary's entire field of knowledge,

---

fact, a fraud on the FDA case. It is far too late for plaintiffs to rely on such a theory, however. Plaintiffs did not state a fraud on the FDA theory of recovery in the complaint. They did not disclose the theory in discovery. They did not articulate the theory in their summary judgment papers.

Mounting a fraud on the FDA case would require a transformation of this litigation that would entail, among other tasks, (i) amending the complaint, (ii) deciding whether the other manufacturers of Amoxicillin were necessary or indispensable parties, (iii) extensive discovery involving the FDA and the other Amoxicillin manufacturers as to what information has and has not been provided to the agency, (iv) and extensive expert discovery as to the relevant risks. None of this has occurred. Despite counsel's efforts to "leave the door open," the Court is satisfied that the issue has not been properly raised in this case.

[21]    This is a diversity action. Accordingly, the law of Maryland, where the injury occurred, applies. See Foster v. American Home Products Corp., 29 F.3d 165, 171 (4th Cir. 1994). Dr. Ramos prescribed the Amoxicillin in Maryland, and Shea took sick in Maryland.

[22]    Lee v. Baxter Healthcare, Corp., No. 89-2143, 1990 WL 27325, **5 (4th Cir. Feb. 27, 1990) (citing Weinberger v. Brystol-Meyers Co., 652 F. Supp.. 187 (D. Md. 1986).

[23]    Nolan v. Dillon, 261 Md. 516, 523, 276 A.2d 36, 40 (1971).

[24]    Lee, 721 F. Supp. at 94-95.

[25]    Id. at 95.

10

however gained.[26]  Even if a label's warnings are inadequate, the doctrine protects a manufacturer from liability provided the doctor has been sufficiently warned from other sources.

There are, therefore, two relevant inquiries.  Were the label warnings themselves adequate?  If not, was the prescribing physician adequately warned from another source?  The instant case is decided by answering the second inquiry.  Dr. Ramos was fully warned of the risk of TEN from his medical training and by reading the warning label for another Amoxicillin product.  Thus, the learned intermediary doctrine applies and is dispositive.

It merits mentioning, however, that the Trimox® package insert was not defective under existing law.  It is hard to see how the changes advocated by the plaintiffs would have materially improved the warning.  As to the placement of the TEN warning, the Warnings section specifically mentions that "[s]erious and occasionally fatal hypersensitivity (anaphylactic) reactions have been reported...."  A physician seeking more information on these potentially life threatening "reactions" would logically refer to the Adverse Reaction section, where SJS and TEN are mentioned by name.  One might prefer to have SJS/TEN listed in the Warnings section, but the present structure cannot be said to be unreasonable merely because it requires the reader to make a cross-reference.

As mentioned, listing the symptoms of SJS/TEN would have had no impact on Shea's case, so their absence does not make the warnings defective.  Finally, there may be instances in

---

[26]    See Hunt v. Hoffmann-La Roche, Inc., 785 F. Supp. 547, 550 (D. Md. 1992) (determining whether a doctor is a learned intermediary by considering the doctor's total knowledge of the risks associated with prescribing Accutane and not limiting the analysis to the manufacturer's warning alone); Hall v. Merck et al., 774 F. Supp. 604, 606 (D. Kan. 1991) ("The only relevant issue to the determination of whether the learned intermediary doctrine applies in this case is whether Dr. Godbole was aware of the risks associated with Dolobid when he prescribed it to plaintiff.").

which a label should quantify the risk of taking the drug as opposed to other drugs that might be substituted. This is not one of them. The plaintiffs were unable to cite a single case in which a court has found a label to be defective because the incidence rate was not described.[27] Moreover, warnings must be brief and focused to be effective. It would require an extended discussion, in the nature of a medical journal article, to lay out the debate between Drs. Blume and Stern. It is also hard to see what the doctor would gain even if he read the expanded discussion. Whether one accepts Dr. Blume's view or Dr. Stern's, the risk of TEN is minuscule in either case. One must also bear in mind that the warnings are intended to be read by learned intermediaries who are presumed to have considerable medical training as well as the ability to access the medical literature if they require additional information.[28]

It appears, therefore, that the Trimox® warning label was not defective. In any event, the alleged defects have no bearing on this case. Under Maryland tort law, the plaintiffs must prove that the inadequate warning caused the injury. "[A] product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the

---

[27] Only one case was cited involving the SJS/TEN warning. In Serna v. Roche Laboratories, Inc., the Court of Appeals of New Mexico held that the TEN warning contained in the package insert for Bactrim was adequate where the warning appeared in the Adverse Reactions section. 101 N.M. 522, 525, 684 P.2d 1187, 1190 (N.M. App. 1984).

[28] See Willett v. Baxter Intern., Inc., 929 F.2d 1094, 1099 n.16 (5th Cir. 1991) ("We, therefore, interpret the duty to warn in the learned intermediate context to require an adequate warning of inherent dangers not within the knowledge of or obvious to the average learned intermediate.").

conduct of the prescribing physician."[29]  Dr. Ramos testified that the warnings advocated by the plaintiffs would not have altered his decision to prescribe Amoxicillin to Shea.[30]

**VI.      Conclusion**

Consumption of Amoxicillin caused Shea's tragic blindness.  This does not mean that the drug was defective.  Prescription drugs are defective only if the risks are inadequately disclosed.  Such is not the case here, and Apothecon is entitled to judgment as a matter of law.  Accordingly, the Court will, by separate Order, GRANT Apothecon's Motion for Summary Judgment.  (Docket No. 74).

Dated the 15th day of May, 2006.

_____/s/_____
Benson Everett Legg
Chief Judge

---

[29]     Motus v. Pfizer Inc., 358 F.3d 659, 661 (9th Cir. 2004) ("Because the doctor testified that he did not read the warning label ... before prescribing the drug to Dr. Motus, the adequacy of Pfizer's warnings is irrelevant to the disposition of this case."); see Kling v. Key Pharm., Inc., 1994 WL 477815, *3 (4th Cir. Sept. 6, 1994).

[30]     See Chambers v. G. D. Searle & Co., 441 F. Supp. 377, 384 (D. Md. 1975) ("the changes in the [warning] language [the Plaintiff] advocated could hardly have been expected to have caused Dr. Morse not to prescribe the drug").